## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| HIGHMARK INC., | ) ) ) ) | Case No. _____ |
| *Plaintiff*, | ) ) ) | |
| v. | ) ) ) | |
| REMOTE NEUROMONITORING PHYSICIANS, PC, and SPECIALTYCARE IOM SERVICES, LLC, | ) ) ) ) ) ) | |
| *Defendants*. | ) | |

## COMPLAINT

Plaintiff, Highmark Inc. ("Plaintiff" or "Highmark"), by and through its undersigned counsel, Reed Smith LLP, hereby submits this Complaint against Defendants Remote Neuromonitoring Physicians, PC ("Remote Neuromonitoring") and SpecialtyCare IOM Services, LLC ("SpecialtyCare", collectively "Defendants") and in support thereof, alleges as follows:

## INTRODUCTION

1.    Highmark brings this action to vacate hundreds of independent dispute resolution ("IDR") payment determinations involving millions of dollars that Defendants procured through fraud, undue means, and misrepresentations of fact presented to certified IDR entities ("IDREs"), and that IDREs issued in excess of their authority over disputes that were never validly subject to the federal No Surprises Act ("NSA") IDR process. In addition, and in the alternative, Highmark asserts tort, statutory, and equitable claims for Defendants' independent misconduct, both because that intentional and fraudulent misconduct caused independent injuries to Highmark that are not duplicative of vacatur and because, if the Court concludes (as it should) that some or all of the

- 1 -

challenged disputes were inarbitrable from the outset or otherwise outside the NSA's judicial review framework, those claims provide an independent basis for relief.

2.       As set forth below, Defendants have exploited the federal NSA, 42 U.S.C. § 300gg-111—a statute enacted to protect commercially insured patients from surprise out-of-network medical bills—by transforming the IDR process into a vehicle for fraud and financial gain. Defendants' scheme is not a good faith attempt to obtain fair reimbursement. It is a deliberate effort to wrongfully extract inflated payments from Highmark through, among other things: (i) the intentional and knowing submission of hundreds of categorically ineligible disputes, including disputes barred by the NSA's 90-day-cooling off period, and (ii) material misrepresentations to IDREs that the NSA's "blind," non-adversarial procedures prevented Highmark from identifying or meaningfully rebutting in real time.

3.       The NSA established the IDR process to resolve limited categories of surprise billing disputes between health plans and out-of-network providers, thereby protecting patients who unknowingly receive out-of-network care or require emergency service from being saddled with excessive balance bills reflecting the gap between a provider's charges and the plan's reimbursement. The IDR process is strictly limited to "qualified IDR items or services" that satisfy defined eligibility criteria, including, among other requirements, that no prior IDR determination has been issued for the same items or services between the same provider and payor within the preceding 90 calendar days (the "90-day cooling off period").

4.       In repeated knowing and intentional violation of this eligibility requirement, Defendants have engaged in a pattern of obtaining IDR payment determinations for particular procedure codes and then, ***often the same day or the very next day***, initiating new IDR disputes

against Highmark involving those identical codes. Defendants do so with full knowledge that such disputes are ineligible for the IDR process under the 90-day cooling-off period.

5.    As a direct and proximate result of Defendants' fraudulent conduct, Highmark has suffered and continues to suffer substantial damages, including improper IDR payment determinations, administrative and IDRE fees, and the diversion of significant resources to address ineligible and fraudulently submitted IDR disputes. While abuse of the IDR process by providers and their billing agents has been well documented and has added at least $5 billion to overall health system costs since its inception, Defendants' fraud goes further, threatening the affordability and sustainability of health care coverage for Highmark's members and the self-insured employer groups—including public school districts, state and local governmental entities, and labor unions—whose benefits Highmark administers across Pennsylvania and nationwide.[1]

6.    Highmark brings this action to put an end to Defendants' exploitation of the IDR process and their deliberate scheme to defraud Highmark through false eligibility attestations and intentional misrepresentations, which Highmark was unable to discover or challenge during the IDR proceedings themselves.

**PARTIES**

7.    Plaintiff Highmark is a not-for-profit health plan and professional health services plan corporation which operates and has its principal place of business in Allegheny County, Pennsylvania.

8.    Defendant Remote Neuromonitoring Physicians, PC is a professional corporation that provides neuromonitoring services to members of health plans administered by Highmark.

---

[1] *See* Jack Hoadley, Kennah Watts, Katie Keith, & Ellie DeGarmo, *The No Surprises Act IDR Process: An Early Look At 2025 Data*, HEALTH AFFAIRS (Mar. 20, 2026), https://www.healthaffairs.org/content/forefront/no-surprises-act-idr-process-early-look-2025-data.

Remote Neuromonitoring maintains its principal place of business in Brentwood, Tennessee. Remote Neuromonitoring is a Pennsylvania-registered corporation and regularly transacts business in the Commonwealth of Pennsylvania. Upon information and belief, Remote Neuromonitoring is affiliated with SpecialtyCare.

9.      Defendant SpecialtyCare IOM Services LLC is a limited liability corporation that both provides neuromonitoring services to health plans administered by Highmark and also helps providers, including Remote Neuromonitoring, with billing. SpecialtyCare maintains its principal place of business in Brentwood, Tennessee. SpecialtyCare is a Pennsylvania-registered corporation and regularly transacts business in the Commonwealth of Pennsylvania.

10.      SpecialtyCare and Remote Neuromonitoring share the same registered address, 3 Maryland Farms, Ste. 200, Brentwood, Tennessee.

11.      SpecialtyCare has identified Remote Neuromonitoring in a variety of court filings as an "affiliated entity." On information and belief, SpecialtyCare administers the IDR process for Remote Neuromonitoring.

## JURISDICTION AND VENUE

12.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Count I arises under the NSA, which expressly provides for judicial review of IDR payment determinations in the limited circumstances set forth in Section 10(a) of the Federal Arbitration Act ("FAA"). *See* 42 U.S.C. § 300gg-111(c)(5)(E)(i)(II) (incorporating 9 U.S.C. § 10(a)(1)–(4)). The NSA further provides that IDR payment determinations "shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim." *Id.* § 300gg-111(c)(5)(E)(i)(I).

13. Highmark seeks vacatur of the IDR payment determinations specified in Exhibit A[2] on the grounds that Defendants procured them through fraudulent claims, misrepresentations of facts, fraud, and undue means, and/or because the IDREs exceeded their authority by issuing determinations over disputes that were not validly subject to the NSA IDR process.

14. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over Highmark's related tort, statutory, declaratory, and equitable claims because those claims arise from the same transactions and occurrences as Count I, including the same IDR submissions, challenged determinations, alleged misrepresentations, payments, administrative fees, and course of conduct.

15. Highmark pleads its tort, statutory, declaratory, and equitable claims in addition to, and in the alternative to, Count I. These claims arise from Defendants' independent misconduct—including fraud and related torts—through which Defendants intentionally submitted disputes they knew to be ineligible for the NSA IDR process, supported by false eligibility attestations, and material misrepresentations in "blind" submissions to IDREs. These claims are pleaded in addition to Count I because they seek redress for distinct injuries. They are pleaded in the alternative because, if the Court determines that some or all of the challenged disputes were categorically ineligible for the NSA IDR process, were inarbitrable from the outset, or otherwise fall outside the NSA's judicial-review provision, then the NSA does not bar Highmark from pursuing independent tort, statutory, declaratory, and equitable remedies for Defendants' misconduct and for determinations that were never valid, binding NSA IDR determinations in the first place.

---

[2] The IDR payment determinations for which Highmark currently seeks vacatur are identified in Exhibit A based on Highmark's reasonable pre-suit investigation and information presently available to it. Because the challenged IDR submissions and determinations involve a high volume of records and information uniquely within Defendants' possession or control, Highmark continues to review the relevant data and reserves the right to supplement, amend, or conform Exhibit A and its requested relief to the evidence developed through discovery, expert analysis, and further investigation.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because: (i) a substantial part of the events or omissions giving rise to the claims occurred in, and were directed toward, this District; and (ii) Highmark is headquartered in this District and has suffered injury here.

## FACTUAL BACKGROUND

### I.     Highmark Is a Community-Focused Health Plan

17.     Highmark is a nonprofit organization that operates as a Blue Cross Blue Shield licensee in Pennsylvania, Delaware, New York, and West Virginia, serving over seven million people. Highmark offers a broad range of high-quality, accessible and affordable health plans – including individual, employer-sponsored, Medicare, and Medicaid options – with an emphasis on providing affordable rates for members, including those with low incomes or who have difficulty getting insurance. As a regional, nonprofit payor, Highmark is community-driven and often seeks strategic partnerships with its largest providers to improve the health and well-being of its members and their communities.

18.     A significant portion of Highmark's business is administrative services only ("ASO"), where Highmark acts as a third-party administrator for self-insured groups and has obligations to pursue recovery of overpayments to providers. These self-insured groups include state and local government entities, public school districts, labor unions, and mid-sized to large private employers, all of which bear the full cost of healthcare claims and immediately absorb the impact of any increase in provider rates. The remainder of Highmark's commercial enrollment is fully-insured business where Highmark is responsible for payment of healthcare costs and managing the risk for a pool of insureds. For this business, insured individuals are impacted by increased care costs in the form of higher health insurance premiums and cost-sharing amounts.

## II.    The No Surprises Act and the IDR Process

19.    Effective January 1, 2022, the NSA banned surprise billing for three categories of out-of-network care: (1) emergency services; (2) non-emergency services at in-network facilities; and (3) air ambulance services. *See* 42 U.S.C. §§ 300gg-131, 300gg-132, 300gg-135. Congress enacted the NSA with a clear purpose: to protect patients from unexpected and often financially devastating medical bills while establishing an independent system to resolve payment disputes in a manner that is "fair to both providers and plans that also does not increase aggregate healthcare system costs."[3] *See* Ban Surprise Billing Act, H.R. Rep. No. 116-615 (2020), at 47, 52–53. Congress recognized that certain out-of-network providers held "substantial market power" and "face[d] highly inelastic demands for their services because patients lack[ed] the ability to meaningfully choose or refuse care," enabling such providers to "charge amounts for their services that . . . result[] in compensation far above what is needed to sustain their practice." *Id.* at 53. Congress further understood that patients, particularly in emergency or facility-based settings, are often unable to avoid or even anticipate out-of-network care, leaving them uniquely vulnerable to these practices. *Id.* Congress noted that this "market failure" was having "devastating financial impacts on Americans and their ability to afford needed health care." *Id.* at 52-53.

20.    When a health plan like Highmark receives a claim for out-of-network services subject to the NSA, the health plan makes an initial payment or issues a notice of denial of payment within 30 days. *See* 42 U.S.C. § 300gg-111(a)(1)(C)(iv)(I). If the provider is dissatisfied with the initial payment, the provider or its designee may initiate open negotiations with the health plan by

---

[3] *See also* Lawson Mansell & Sage Mehta, *New data shows No Surprises Act arbitration is growing healthcare waste*, NISKANEN CENTER (June 18, 2025), https://www.niskanencenter.org/new-data-shows-no-surprises-act-arbitration-is-growing-healthcare-waste/; *Evidence on Surprise Billing: Protecting Consumers with the No Surprises Act*, Issue Brief No. HP-2021-24, Off. of the Ass't Sec'y for Planning & Evaluation, U.S. Dep't of Health & Human Servs. (Nov. 22, 2021), http://resource.nlm.nih.gov/9918539088506676.

providing formal written notice within 30 business days of the initial payment or notice of denial. 42 U.S.C. § 300gg-111(c)(1)(A).

21.    After initiating open negotiations, the provider must attempt in good faith to negotiate a resolution with the health plan over a 30-business-day open negotiations period. If the open negotiations do not result in a determination of an amount of payment, the provider may then initiate the IDR process within four business days. See 42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(b)(2)(i).

22.    The IDR process is only available for a "qualified IDR item or service" that meets strict statutory and regulatory criteria. To be eligible, the following conditions must, among others, be satisfied: (a) the underlying services fall within the NSA's scope; (b) the services involve a patient with health care coverage subject to the NSA; (c) no specified state surprise billing law applies; (d) the underlying services were covered by the patient's health benefit plan; (e) the patient did not waive the NSA's balance billing protections; (f) the provider initiated and exhausted open negotiations; (g) the provider initiated IDR within 4 business days after open negotiations were exhausted; and (h) the provider has not had a previous IDR determination on the same services and against the same payor in the previous 90 calendar days. 42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(a)(2)(xi), (b)(2).

## III.    The 90-Day Cooling-Off Period

23.    The requirement that a provider not have had a previous IDR determination on the same services and against the same payor in the previous 90 calendar days — commonly referred to as the "90-day cooling-off period" — is a critical gatekeeping provision of the NSA.

24.    The 90-day cooling-off period ensures that the IDR process is used for the bona fide resolution of discrete billing disputes rather than as a mechanism for providers to serially

relitigate rate determinations by flooding the system with duplicative disputes. Congress enacted this provision to incentivize health care providers and payors to resolve their differences amongst themselves, consistent with the NSA's purpose of creating a streamlined process.

25. Under 45 C.F.R. § 149.510(c)(3)(i), following an IDR determination involving a particular provider and a particular health plan with respect to the same or similar item or service, neither party may submit a new IDR claim involving the same or similar item or service against the same party for 90 calendar days following the determination.

## IV. The IDR Process Is a Blind Proceeding

26. The NSA's IDR payment determination process resembles a baseball-style arbitration. The provider and health plan each submit an offer, and the IDRE selects one party's offer as the out-of-network rate. 42 U.S.C. § 300gg-111(c)(5)(B).

27. In making its determination, the IDRE must consider the QPA — generally the plan's median in-network rate for the same service in the same geographic area — and several "additional circumstances," such as the training, experience, and quality of the provider, its market share, and the acuity of the patient. 42 U.S.C. § 300gg-111(c)(5)(C).

28. The IDR process is a blind proceeding: each party submits its final offer and supporting evidence without the right or ability to see the other party's submission. There is no mechanism for discovery, cross-examination, or adversarial testing of the opposing party's representations to the IDRE.

29. The blind nature of the process means that a party to an IDR proceeding has no ability during the proceeding itself to identify, challenge, or rebut misstatements or false evidence submitted by the opposing party in its IDR submission package. Nor does the statute or implementing regulations provide any right for a party to obtain or review the opposing party's

submission during the proceeding. At most, a party may learn what the opposing side submitted only after the IDRE has already rendered its payment determination—and even then, only if the IDRE elects to share that information. As a result, any such disclosure is discretionary rather than guaranteed, and in many cases a party may never obtain access to the materials on which the determination was based.

**V.      The IDR Portal Requires Attestations of Eligibility**

30.      Parties must initiate the IDR process online through a federal "IDR Portal." The website for submissions is https://nsa-idr.cms.gov/paymentdisputes/s/. The portal is specifically designed to guide initiating parties through eligibility requirements and to prevent the submission of ineligible disputes.

31.      At the outset, before an initiating party can begin completing the Notice of IDR Initiation Form, the portal displays a prominent warning in a blue box stating: "*Disputing parties will generally have 4 business days from the conclusion of their open negotiation period to submit a Notice of IDR Initiation, unless the dispute qualifies for an exception, **such as the dispute being subject to the 90-day cooling off period**, the dispute having received prior approval for an extension, or a certified IDR entity has requested the party to resubmit the dispute.*" This warning alerts users to both timing requirements and potential disqualifying conditions, including the 90-day cooling off period.

> ℹ Disputing parties will generally have **4 business days** from the conclusion of their open negotiation period to submit a Notice of IDR Initiation, unless the dispute qualifies for an exception, such as the dispute being subject to the 90-day cooling off period, the dispute having received prior approval for an extension, or a certified IDR entity has requested the party to resubmit the dispute.
>
> IMPORTANT: The administrative fee is $115.00.
>
> NOTE: Once you complete the Notice of IDR Initiation, download a copy and send the Notice of IDR Initiation PDF to the Non-Initiating Party.
>
> REMINDER: You must complete and submit the form in a single session. For security reasons and protection of personal data, your session will time out after 60 minutes of inactivity.

32.     Before proceeding, the initiating party must agree to the portal's terms and conditions and complete a series of "Qualification Questions." The terms and conditions include a notice that the initiating party must submit an "**[a]ttestation that qualified IDR items or services are within the scope of the Federal IDR process**."

> Along with the general information you'll need to start your Federal IDR dispute process, provide:
> - Information to identify the qualified IDR items or services (and whether they are designated as batched or bundled items or services)
> - Dates and location of qualified IDR items or services
> - Type of qualified IDR items or services such as emergency services and post-stabilization services
> - Codes for corresponding service and place-of-service
> - Attestation that qualified IDR items or services are within the scope of the Federal IDR process
> - Your preferred certified IDR entity

33.     These questions are designed to assess whether the dispute meets the statutory and regulatory criteria for IDR eligibility. If the responses indicate that the dispute is ineligible—for example, because it falls within the 90-day cooling off period—the portal generates an alert and prevents the user from continuing.

34.     Even after agreeing to the terms and conditions, the first page of the Notice of IDR Initiation Form reiterates that disputes falling within the 90-day cooling off period are ineligible for IDR. Thus, the portal provides repeated, explicit notice of this limitation before any submission is completed.



ℹ Disputing parties will generally have **4 business days** from the conclusion of their open negotiation period to submit a Notice of IDR Initiation, unless the dispute qualifies for an exception, such as the dispute being subject to the 90-day cooling off period, the dispute having received prior approval for an extension, or a certified IDR entity has requested the party to resubmit the dispute.

IMPORTANT: The administrative fee is $115.00.

NOTE: Once you complete the Notice of IDR Initiation, download a copy and send the Notice of IDR Initiation PDF to the Non-Initiating Party.

REMINDER: You must complete and submit the form in a single session. For security reasons and protection of personal data, your session will time out after 60 minutes of inactivity.

35.    At the conclusion of this process, the submitting party must attest, via electronic signature, that the "**item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process**." A copy of the completed Notice of IDR Initiation, including this attestation, is then provided to the non-initiating party, the IDRE, and the federal Departments.



☑ I, the undersigned initiating party (or representative of the initiating party), attest that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.

\* **Initiating party (or representative of the initiating party):**     \* **Date:**

| Print Name | 04/16/2026 |

36.    At multiple stages throughout the portal workflow—from initial warnings, to qualification screening, to final attestation—the initiating party is required to acknowledge and affirm compliance with IDR eligibility requirements. By the time a dispute is submitted, the initiating party has been repeatedly notified of, and has affirmatively represented compliance with, the governing limitations of the IDR process.

37.    The notice and attestation requirements do not end with submission of a dispute. When an IDRE issues a payment determination, it provides the parties with a written decision that

expressly reiterates the 90-day cooling-off period. Specifically, the IDRE notifies the initiating party that it may not submit a subsequent dispute involving the same or similar item or service against the same opposing party—here, Highmark—within 90 days. The determination further identifies the date on which the cooling off period expires, thereby providing clear, individualized guidance as to when a new dispute may be filed.

> The party that initiated the Federal IDR Process may not submit a subsequent Notice of IDR Initiation involving the same other party with respect to a claim for the same or similar item or service that was the subject of this dispute during the 90-calendar-day suspension period following the date of this email, also referred to as the "cooling off" period.
>
> If the initiating party was a provider, the provider is identified by the National Provider Identifier (NPI) or Taxpayer Identification Number (TIN). During the cooling off period, the provider may not submit a subsequent Notice of IDR Initiation involving the same non-initiating party with respect to a claim billed under the same NPI or TIN for the same or similar item or service.
>
> The initiating party with respect to dispute number DISP-1851702 was BROMEDICON, LLC. The initiating party's NPI is 1003321316 and TIN is 364875473. The non-initiating party was BCBS PA HIGHMARK. The 90-calendar day cooling off period begins on November 22, 2024 . Please retain this information for your records.

38.    These post-determination notices are clear and explicit. They leave no ambiguity as to the applicability or duration of the 90-day cooling-off period. Despite receiving these repeated, individualized warnings—including the precise date on which new disputes would become eligible—Defendants nevertheless submitted hundreds of disputes that fell within the prohibited 90-day period.

## VI.    Defendants' Fraudulent Scheme

### A.    Knowing Violation of the 90-Day Cooling-Off Period

39.    Defendants have engaged in a deliberate and systematic scheme to exploit the IDR process by knowingly initiating IDR disputes that are ineligible under the NSA's 90-day cooling-off period.

40.    The NSA expressly prohibits providers from initiating IDR proceedings for the same item or service against the same payor within 90 days of a prior IDR determination. Each

IDR determination provides explicit notice of this restriction, ensuring that providers and their representatives, like Defendants, are aware of the prohibition and the applicable timeframe before submitting additional disputes.

41.    Despite this clear rule and repeated notice, Defendants routinely initiated new IDR disputes for the same procedure codes within the 90-day cooling-off period—often within days of receiving an IDR determination.

42.    At the same time, Highmark was inundated with hundreds of IDR disputes involving multiple providers and procedure codes, while Defendants alone controlled the decision to initiate each dispute. Despite being in the unique position to refrain from submitting ineligible claims, Defendants instead chose to engage in a pattern of serial, improper filings in violation of the NSA's requirements.

43.    By way of example, and without limitation, the following instances illustrate Defendants' repeated and knowing violations of the 90-day cooling-off requirement:

a.    On May 3, 2023, Defendants obtained an IDR payment determination for procedure code 95938 (DISP-214789), triggering a 90-day cooling-off period through at least August 1, 2023. The payment determination letter, in this instance from Medical Evaluators of Texas, included the following restriction: "The party that initiated the Federal IDR Process may not submit a subsequent Notice of IDR Initiation involving the same other party with respect to a claim for the same or similar service that was the item or subject of this dispute during the 90-calendar-day suspension period following the date of this email, also referred to as the 'cooling off' period."

b.    Notwithstanding this restriction, Defendants initiated two additional IDR disputes for this same procedure code on the next day, May 4, 2023, including DISP-394080 and

DISP-394281. Defendants then obtained another IDR payment determination for the same procedure code just 4 days later, on May 8, 2023 (DISP-228717).  The payment determination letter, in this instance from C2C Innovative Solutions, Inc., contained the following language regarding the 90-day cooling-off period: "The party that initiated the Federal IDR Process may not submit a subsequent Notice of IDR Initiation involving the same other party with respect to a claim for the same or similar service that was the item or subject of this dispute during the 90-calendar-day suspension period following the date of this email, also referred to as the 'cooling off' period."

c.    Despite this, Defendants initiated yet another IDR dispute for the same procedure code just two days later on May 10, 2023, DISP- 404291, as well as another a mere 29 days later (DISP-437278).

d.    The violations for procedure code 95938 continued to cascade over the ensuing months as additional determinations within the same cooling-off period restarted the 90-day clock and provided Defendants with repeated, individualized notice of the cooling-off restriction. The pattern continued; Defendants obtained yet another IDR payment determination for the same procedure code on June 12, 2023 (still nearly 2 months before the expiration of the initial 90 day period from DISP-214789), which contained the same language regarding the cooling-off period.  That determination was for DISP-278253.  Defendants obtained yet another IDR payment determination for the same procedure code (DISP-394316) on July 10, 2023, still nearly a month prior to the expiration of the original cooling-off period.  Nevertheless, Defendants continued to submit additional IDR disputes for the same procedure code, including one on the very next day, July 11, 2023 (DISP-508901).

e.    It was not uncommon for Defendants to submit multiple disputes for the same procedure code simultaneously after obtaining an IDR payment determination for that same

code.  For example, on February 2, 2024, Defendants obtained a payment determination for procedure code 95938 (DISP-180614).  The payment determination letter, from C2C Innovative Solutions, Inc., contained the same language notifying Defendants of the 90-day cooling-off period as the letters referenced previously.  Notwithstanding this, in the same month, on February 29, 2024, Defendants submitted three more dispute initiations for that same code – DISP-1079465, DISP-1079538 and DISP-1079596.

f.  This was not only happening with respect to a single procedure code.  On June 26, 2024, Defendants obtained an IDR payment determination for procedure code 95870 (DISP-870051), triggering a 90-day cooling-off period through at least September 24, 2024.  The payment determination letter, from C2C Innovative Solutions, Inc., contained the following language: "The party that initiated the Federal IDR Process may not submit a subsequent Notice of IDR Initiation involving the same other party with respect to a claim for the same or similar service that was the item or subject of this dispute during the 90-calendar-day suspension period following the date of this email, also referred to as the 'cooling-off' period."  The letter also identified the start of the 90-day cooling-off period as September 24, 2024.

g.  Notwithstanding this restriction, Defendants initiated additional IDR disputes for the same procedure code almost immediately thereafter, including two disputes on July 8, 2024 and another two disputes initiated on July 19, 2024.

h.  During the same cooling-off period, Defendants received yet another IDR determination for procedure code 95870 on August 2, 2024 (DISP-199567), which again expressly notified Defendants of the 90-day prohibition and restarted the cooling-off period. Despite this repeated notice, Defendants continued to initiate additional IDR disputes for the same procedure

code, including two submitted on August 14, 2024 and two more submitted on August 20, 2024—all within the applicable cooling-off period.

44.     Defendants' pattern of initiating new IDR disputes after receiving an IDR award for the identical procedure code is not the product of inadvertence or mistake. The IDR Portal's Qualification Questions specifically inquire about prior IDR determinations and the applicable cooling-off period. To submit these ineligible disputes, Defendants had to provide false information about prior determinations and falsely attest that the disputes were eligible for IDR.

45.     Defendants knew, at the time each such dispute was initiated, that an IDR determination had been made on the same services and involving the same payor — Highmark — within the preceding 90 calendar days. Remote Neuromonitoring knew because it had been a party to the prior determination, and SpecialtyCare knew because, upon information and belief, it served as Remote Neuromonitoring's third-party biller and IDR administrator and prepared, transmitted, or caused to be transmitted both the prior and subsequent disputes.

46.     As a further indication of Defendants' knowing and intentional conduct, the sheer volume and timing of these filings demonstrate a calculated strategy to exploit the IDR system before Highmark or the IDREs can identify and object to the ineligibility of the disputes. The 90-day cooling-off period requires a health plan to cross-reference each newly initiated dispute against every prior IDR determination involving the same provider and the same procedure code, to determine whether the new dispute falls within a prior cooling-off window. Performing that analysis in real time is extraordinarily difficult—and, as a practical matter, not reasonably possible—given the volume of disputes Defendants file on top of the hundreds of disputes initiated each day by other out-of-network providers and their representatives across the country.

47. During the first half of 2025 alone, disputing parties initiated more than 1.18 million disputes nationwide. Highmark receives only a Notice of IDR Initiation—not a flag identifying a potential cooling-off violation—and must identify any eligibility deficiency and raise formal objection within three business days. Reasonableness does not require a health plan to perform a forensic-level, dispute-by-dispute reconciliation of thousands of incoming IDR initiations each day against a rolling database of every prior determination, for every procedure code, for every provider, across every 90-day window.

48. Highmark has now been able to reconstruct and trace Defendants' pattern of cooling-off violations as set forth in detail in this Complaint. But the fact that these violations are identifiable in hindsight does not mean they were reasonably detectable at the speed the IDR process demands.

49. As a result, Highmark has been compelled to pay IDR awards on disputes that were ineligible for the IDR process in the first place—and to pay those awards at rates far exceeding the QPA that Congress expected would serve as the baseline in most IDR proceedings. In some instances, the awards Defendants obtained exceeded even the providers' own billed charges. Highmark has to date been stuck bearing the financial consequences of Defendants' fraud: bound by payment determinations that should never have been rendered, at prices inflated well beyond any measure of reasonable reimbursement.

50. The IDR process has been overwhelmed by a staggering volume of disputes that far exceed the government's initial estimates. Before the IDR process launched, CMS estimated that parties would initiate about 17,000 IDR disputes each year.[4] Providers have shattered those estimates. To say that out-of-network providers have filed more IDR cases than anticipated would

---

[4] *See Requirements Related to Surprise Billing; Part II*, 86 Fed. Reg. 55,980, 56,056 (Oct. 7, 2021), https://www.federalregister.gov/documents/2021/10/07/2021-21441/requirements-related-to-surprise-billing-part-ii.

be a gross understatement. In only the first nine months after the IDR system opened in 2022, about 190,000 disputes were filed—more than ten times the number expected for the first year alone. From 2022 to June 2025, more than 3.4 million disputes were filed.[5] Large medical staffing provider groups were responsible for filing a majority of these disputes.[6] And the number of disputes is only continuing to increase: Even more recent bi-monthly updates from CMS show that nearly 1.4 million cases were filed from July 2025 through December 2025.[7] This has resulted in a whopping 4.8 million total cases through the end of 2025.[8]

51.    In the second half of 2024, disputing parties—virtually all of whom are providers—initiated **853,374 disputes**, **40% more** than the first half of 2024 (610,498).[9] This figure from **six months** is more than **50 times** the volume of disputes the government originally anticipated for a **full year**. Similar to the last six months of 2024, the first half of 2025 "was characterized by an increasingly large volume of disputes submitted through the Federal IDR portal."[10] Disputing parties initiated **1,186,812 disputes**, **39% more** than the second half of 2024 (853,374 disputes), with providers or their representatives initiated the majority of disputes (**81%**).[11]

---

[5] *See* Jack Hoadley, Kennah Watts, Katie Keith, & Ellie DeGarmo, *The No Surprises Act IDR Process: An Early Look At 2025 Data*, HEALTH AFFAIRS (Mar. 20, 2026), https://www.healthaffairs.org/content/forefront/no-surprises-act-idr-process-early-look-2025-data.

[6] *See* Jack Hoadley & Kennah Watts, *The Substantial Costs Of The No Surprises Act Arbitration Process*, HEALTH AFFAIRS (Aug. 25, 2025), https://www.healthaffairs.org/content/forefront/substantial-costs-no-surprises-act-arbitration-process; *Profiting on all Sides: Private Equity and the No Surprises Act*, PRIVATE EQUITY STAKEHOLDER PROJECT (Nov. 5, 2025), https://pestakeholder.org/news/profiting-on-all-sides-private-equity-and-the-no-surprises-act.

[7] *See* Federal IDR bi-monthly reports, https://www.cms.gov/nosurprises/policies-and-resources/Reports.

[8] *See* Jack Hoadley, Kennah Watts, Katie Keith, & Ellie DeGarmo, *The No Surprises Act IDR Process: An Early Look At 2025 Data*, HEALTH AFFAIRS (Mar. 20, 2026), https://www.healthaffairs.org/content/forefront/no-surprises-act-idr-process-early-look-2025-data.

[9] *Supplemental Background on the Federal IDR Public Use Files, July 1, 2024—Dec. 31, 2024* (as of May 28, 2025), available at https://www.cms.gov/files/document/federal-idr-supplemental-background-2024-q3-2024-q4.pdf.

[10] *Supplemental Background on the Federal IDR Public Use Files, January 1, 2025—June 30, 2025* (as of Jan. 21, 2026), available at https://www.cms.gov/files/document/federal-idr-supplemental-background-2025-q1-2025-q2.pdf.

[11] *Id.* at 2.

52.    Government reporting also shows that most disputes are initiated by a small number of providers and their representatives. The top ten initiating parties represented approximately 69% of all disputes initiated in the first six months of 2025, similar to the last six months of 2024 (71%), and the top three initiating parties accounted for about 44% of disputes.[12]

53.    By strategically submitting massive numbers of ineligible IDR disputes, Defendants seek to overwhelm the ability of health plans like Highmark to contest claims and to overwhelm IDREs who must process disputes within the NSA's tight timelines.

54.    IDREs must process eligibility and payment issues within compressed timelines and often rely on the initiating party's representations in the Notice of IDR Initiation. Defendants exploited those procedures by submitting high volumes of disputes and repeatedly attesting to eligibility even where the 90-day cooling-off period barred the dispute.

55.    Government data confirms that providers prevail in a high percentage of IDR payment determinations and that provider awards frequently exceed the QPA. In the most recent reporting period, providers prevailed in **88%** of IDR payment determinations (compared to 85% in 2024 and 81% in 2023).[13] These market-wide facts are relevant here to explain the incentives and volume pressures that made Defendants' misconduct difficult to detect in real time.

### B. SpecialtyCare's Role and Incentives

56.    As noted above, SpecialtyCare regularly identifies Remote Neuromonitoring as an "Affiliated Entity", though the exact structure of the affiliation is not known at this time.

57.    SpecialtyCare acted as the primary agent for Remote Neuromonitoring with respect to its NSA submissions and initiations.

---

[12] *Id.*

[13] *Supplemental Background on the Federal IDR Public Use Files, January 1, 2025—June 30, 2025* (as of Jan. 21, 2026) at 4, available at https://www.cms.gov/files/document/federal-idr-supplemental-background-2025-q1-2025-q2.pdf.

58.     SpecialtyCare submitted hundreds of IDR initiation requests on behalf of Remote Neuromonitoring, and intentionally submitted both ineligible claims and claims which violated the mandatory 90-day cooling-off period.

59.     In emails with Highmark, Highmark was instructed to contact Remote Neuromonitoring by using an email address with the specialtycare.net domain name.  In addition, in the email signature used by the "No Surprises Act Team", the sender (while using a specialtycare.net domain name) was identified as "Remote Neuromonitoring Physicians PC / SpecialtyCare".

60.     In Remote Neuromonitoring's submissions to the IDRE, it used data from SpecialtyCare as a whole, including payment data and data as to complications in various types of medical procedures, to bolster its own arguments.

61.     SpecialtyCare has initiated at least 20 different lawsuits against various health care companies seeking to enforce its rights under the NSA. This, despite clear evidence that SpecialtyCare has itself acted in violation of the NSA on hundreds of occasions merely with respect to Highmark, let alone with respect to other insurers.

62.     It is clear that SpecialtyCare benefits from this scheme, as any funds which flow to Remote Neuromonitoring also flow, at least in part, to SpecialtyCare.

## VII.     Defendants' Conduct Has Caused Substantial Harm to Highmark

63.     As a direct and proximate result of Defendants' fraudulent conduct, Highmark has suffered injuries that flow directly from Defendants' fraudulent scheme and are separate and apart from the impact of any individual IDR payment determination. These injuries include excessive payments procured through false attestations of eligibility and material misrepresentations in IDR submissions.

64. Highmark has also incurred substantial administrative and IDR-related fees in connection with Defendants' ineligible disputes. Both parties to an IDR proceeding must pay a non-refundable administrative fee when a dispute is initiated. This fee is not recoverable even when the dispute is determined to be ineligible for IDR. Both parties must also pay an IDRE fee before the IDRE makes the payment determination.

65. Moreover, Highmark has been forced to divert significant internal resources to respond to and process Defendants' ineligible and fraudulently procured IDR disputes, resources that would otherwise be devoted to serving Highmark's members and plan participants.

66. The financial harm caused by Defendants' fraudulent practices is ongoing and threatens the affordability and sustainability of health benefits for Highmark's members and ASO customers. This includes self-funded groups such as state and local governmental entities, public school districts, and labor unions—budget-constrained entities that rely on Highmark to manage costs, and whose exposure to inflated claims directly damages Highmark's business relationships and competitive position. Excessive IDR awards drive up health care costs, which ultimately may result in higher premiums for consumers. The costs to employers and health plan members are inextricably linked to the reimbursement rates that health plans negotiate with each health care provider in their provider network. If left unchecked, Defendants' conduct will continue to deplete funds set aside for covering healthcare for citizens of Pennsylvania and nationwide, incentivize copy-cat behavior by other out-of-network providers, and make it more difficult for health plans like Highmark to build provider networks that help control the cost and quality of healthcare. Defendants' conduct also places providers who do the right thing—either by contracting with health plans and honoring the reimbursement rates they agreed to or by charging fair, market rates for out-of-network services—at a substantial competitive disadvantage.

- 22 -

## COUNT I
### VACATUR OF IDR PAYMENT DETERMINATIONS PROCURED BY FRAUD, UNDUE MEANS, AND MISREPRESENTATIONS OF FACT, AND ISSUED IN EXCESS OF IDRE AUTHORITY (42 U.S.C. § 300gg-111(c)(5)(E); 9 U.S.C. § 10(a)(1), (4))

67. Highmark incorporates by reference all preceding paragraphs as though fully set forth herein.

68. The NSA provides that a determination of a certified IDR entity under subparagraph (A) "(I) shall be binding upon the parties involved, in the absence of a fraudulent claim or evidence of misrepresentation of facts presented to the IDR entity involved regarding such claim," and "(II) shall not be subject to judicial review except in a case described in any of paragraphs (1) through (4) of section 10(a) of title 9." 42 U.S.C. § 300gg-111(c)(5)(E)(i). Section 10(a) of the Federal Arbitration Act permits vacatur where, among other things, an award was "procured by corruption, fraud, or undue means," 9 U.S.C. § 10(a)(1), or where "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made," 9 U.S.C. § 10(a)(4). Highmark invokes both the NSA's fraudulent-claim-and-misrepresentation language and the incorporated FAA vacatur grounds.

69. Count I seeks vacatur of the IDR payment determinations identified in Exhibit A on the grounds that, under the statute, the arbitrator exceeded their powers. In addition, Count I seeks vacatur on the grounds that many of the disputes submitted for arbitration were ineligible for the NSA process.

70. The challenged determinations identified in **Exhibit A** and the representative examples alleged above involving disputes submitted during an unexpired 90-day cooling-off period should be vacated under 9 U.S.C. § 10(a)(4). The NSA authorizes IDRE payment determinations only for qualified IDR items or services, and cooling-off-barred disputes are not

qualified IDR items or services; by issuing payment determinations on those disputes, the IDREs exceeded their powers. Highmark pleads that § 10(a)(4) ground without waiving the alternative argument that threshold eligibility determinations on non-qualified, inarbitrable disputes fall outside the NSA's judicial review provision and therefore do not preclude the alternative tort, statutory, and equitable claims pleaded below.

71.    Under Count I, Highmark seeks an order vacating each IDR payment determination identified in Exhibit A and the representative examples alleged above, together with the amounts Highmark paid pursuant to those determinations and the associated administrative and IDRE fees.

## <u>COUNT II</u> FRAUD AND INTENTIONAL MISREPRESENTATION

72.    Highmark incorporates by reference all preceding paragraphs as though fully set forth herein.

73.    Highmark pleads this Count and the other tort, statutory, and equitable Counts that follow, in addition to, and in the alternative to, Count I. These Counts are pleaded in addition to Count I because Defendants' misconduct caused independent injuries, including but not limited to administrative and IDRE fees Highmark was forced to incur and the diversion of Highmark's personnel and resources to detect, investigate, and respond to Defendants' conduct. These Counts are pleaded in the alternative to Count I because, if the Court concludes that some or all of the challenged disputes were categorically ineligible for the NSA IDR process, were inarbitrable from the outset, or otherwise were not governed by the NSA's judicial-review provision, then the challenged determinations are not binding NSA IDR determinations, the NSA does not bar these Counts, and Highmark is entitled to pursue full tort, statutory, restitutionary, and equitable relief for Defendants' misconduct.

74.    As set forth above, Defendants knowingly and intentionally made false representations of material fact to Highmark, the IDREs, and the federal Departments in connection with their initiation of and participation in the IDR process. These false representations include, but are not limited to:

a.    Falsely attesting that items and services submitted to the IDR process were "qualified item(s) and/or service(s) within the scope of the Federal IDR process" when Defendants knew that the items and services were ineligible, including due to the NSA's 90-day cooling-off period;

b.    Providing false and misleading information on the federal IDR Portal, including inaccurate responses to the Qualification Questions regarding prior IDR determinations, in order to bypass safeguards designed to prevent the submission of ineligible disputes;

c.    Falsely representing to IDREs that Highmark failed to engage in dialogue regarding in-network reimbursement rates and failed to provide adequate information concerning its QPA calculations, and further asserting that such purported deficiencies warranted a default or presumptive ruling in Defendants' favor.

75.    Defendants made each of these representations with knowledge of their falsity. With respect to the 90-day cooling-off period violations, Remote Neuromonitoring was a party to the prior IDR determinations that rendered the subsequent disputes ineligible. SpecialtyCare submitted those disputes.

76.    Defendants made these false representations with the intent that Highmark, the IDREs, and the Departments rely upon them, for the purpose of obtaining money from Highmark through IDR payment determinations that Defendants knew were based on ineligible disputes and materially misleading submissions. To the extent Defendants' misrepresentations were made

directly to the IDREs rather than to Highmark, Defendants specifically intended that Highmark rely upon those misrepresentations. Defendants knew that Highmark was the payor that would be bound by and compelled to pay any IDR payment determination procured through their false submissions. Defendants further knew that the blind nature of the IDR process would prevent Highmark from discovering or challenging their misstatements. Highmark was thus the foreseeable and specifically intended victim of Defendants' misrepresentations to the IDREs.

77. Highmark reasonably, foreseeably, and justifiably relied on Defendants' false representations. With respect to the false eligibility attestations, once Defendants initiated the IDR process, Highmark was compelled to participate and respond within the NSA's compressed timelines. In many instances, the sheer volume of Defendants' ineligible filings—layered on top of the hundreds of IDR disputes initiated daily by other out-of-network providers—made it practically impossible for Highmark to identify every cooling-off violation in the three business days permitted for raising eligibility objections. Tracking the 90-day cooling-off period requires cross-referencing each new dispute against every prior determination for the same procedure code, same provider, and same payor across a rolling 90-day window—a forensic-level undertaking that no health plan could reasonably be expected to perform in real time at the scale and speed the IDR process demands. Highmark necessarily relied on Defendants' portal attestations that each dispute satisfied the NSA's eligibility requirements.

78. Only with the benefit of time and forensic analysis has Highmark been able to reconstruct the full scope of Defendants' cooling-off violations. As a consequence, Highmark has been compelled to pay IDR awards on disputes that were ineligible for the IDR process in the first instance—at rates far exceeding the QPA and, in some cases, exceeding even the providers' own billed charges. With respect to the misrepresentations in IDR submissions, Highmark could not

have discovered these misrepresentations during the IDR process because the blind submission process precluded Highmark from viewing Defendants' submission packages. Highmark's reliance was therefore justified because it had no opportunity to challenge or rebut these concealed misstatements.

79. As a direct and proximate result of Defendants' fraud, Highmark has suffered substantial damages, including, but not limited to: (a) payments on IDR payment determinations that were procured through ineligible disputes and material misrepresentations; (b) non-refundable administrative and IDRE fees associated with ineligible IDR disputes; and (c) expenditure of internal resources to process and respond to Defendants' fraudulent submissions.

80. Defendants' fraud was deliberate, systematic, and willful, warranting an award of punitive damages.

## COUNT III
## NEGLIGENT MISREPRESENTATION

81. Highmark incorporates by reference all preceding paragraphs as though fully set forth herein.

82. Highmark pleads this Count in addition to, and in the alternative to, Count I, and on the same bases set forth in paragraph 72 above.

83. In submitting false attestations of eligibility and making material misrepresentations in its IDR submissions, Defendants misrepresented material facts to Highmark, the IDREs, and the Departments regarding the eligibility and merits of the disputes it submitted to the IDR process.

84. Based on the plain text of the NSA and its implementing regulations, the information available to Defendants through the IDR Portal's Qualification Questions, Defendants' own records of prior IDR determinations, and Highmark's communications during

- 27 -

open negotiations, Defendants had no reasonable grounds on which to believe or represent that the disputes were eligible for IDR or that the factual representations in the submissions were accurate.

85.     Defendants made these misrepresentations in the course of their business and in a transaction in which they had a pecuniary interest, intending that Highmark, the IDREs, and the Departments rely upon them.

86.     Highmark justifiably relied on Defendants' misrepresentations for the reasons set forth above, including that the blind nature of the IDR process precluded Highmark from discovering the misstatements in Defendants' submissions until after the proceedings concluded.

87.     As a direct and proximate result of Defendants' negligent misrepresentations, Highmark has suffered substantial damages as set forth above.

## COUNT IV
## CIVIL CONSPIRACY

88.     Highmark incorporates by reference all preceding paragraphs as though fully set forth herein.

89.     Highmark pleads this Count in addition to, and in the alternative to, Count I, and on the same bases set forth in paragraph 72 above.

90.     Defendants knowingly agreed, combined, and acted in concert to carry out the fraudulent scheme described herein, including in connection with engaging in open negotiations, initiating ineligible IDR disputes, preparing and submitting materially false IDR submission packages, and collecting the resulting proceeds.

91.     This conspiracy is further supported by SpecialtyCare's role as Remote Neuromonitoring's third-party biller and IDR representative and by the broader apparent affiliation between SpecialtyCare and Remote Neuromonitoring, including operating out of the same primary address.  Upon information and belief, Remote Neuromonitoring is affiliated with, owned by,

controlled by, or operating in concert with SpecialtyCare. Each participant in this conspiracy shared the common objective of defrauding Highmark by exploiting the IDR process through false eligibility attestations and materially misleading IDR submissions, and each committed overt acts in furtherance of the conspiracy, including the submission of false attestations, the preparation and filing of misleading IDR submission packages, the pursuit of open negotiations based on false premises, and the collection of improper IDR awards.

92.     As a direct and proximate result of this conspiracy, Highmark has suffered substantial damages as set forth above.

## COUNT V
## UNJUST ENRICHMENT

93.     Highmark incorporates by reference all preceding paragraphs as though fully set forth herein.

94.     Highmark pleads this Count in addition to, and in the alternative to, Count I, and on the same bases set forth in paragraph 72 above.

95.     Defendants have been unjustly enriched by receiving IDR payment determinations and associated payments from Highmark for disputes that were ineligible for the IDR process under the 90-day cooling-off period and that were procured through material misrepresentations in Defendants' IDR submissions.

96.     Highmark conferred a benefit upon Defendants by making payments in compliance with IDR determinations that were the product of Defendants' fraud and misrepresentation. Defendants appreciated and knowingly accepted such benefit.

97.     Under the circumstances, it would be inequitable and unjust for Defendants to retain the payments and related compensation obtained through their fraudulent conduct.

98.    Highmark is entitled to restitution of all amounts improperly obtained by Defendants through the fraudulent conduct described herein.

## COUNT VI
### DECLARATORY AND INJUNCTIVE RELIEF 28 U.S.C. §§ 2201–2202 AND ANCILLARY EQUITABLE PRINCIPLES

99.    Highmark incorporates by reference all preceding paragraphs as though fully set forth herein.

100.    Highmark pleads this Count in addition to, and in the alternative to, Count I. It is pleaded in addition to Count I to the extent it provides declaratory and ancillary equitable relief that is not duplicative of the vacatur sought in Count I. It is pleaded in the alternative to Count I because, if the Court determines that some or all of the challenged disputes were categorically ineligible for the NSA IDR process, were inarbitrable from the outset, or otherwise were not governed by the NSA's judicial-review provision, then the challenged determinations identified in Exhibit A are not binding NSA IDR determinations and Defendants may not enforce, collect, or retain payment based on them.

101.    An actual controversy exists between Highmark and Defendants concerning Defendants' ongoing practice of initiating IDR disputes that are ineligible under the 90-day cooling-off period and submitting materially misleading IDR submission packages.

102.    Highmark seeks declaratory and injunctive relief in the alternative to Count I and, to the extent Count I is granted in addition to vacatur and restitution. The requested relief is directed to Defendants' independent conduct—false eligibility attestations, fabricated or misleading submissions, and submission of ineligible disputes barred by the 90-day cooling-off period—and not to broad supervision of the IDR system generally.

103. Rather, Highmark seeks a judicial declaration regarding the lawfulness of Defendants' pattern and practice of fraudulent and deceptive conduct, and prospective injunctive relief to prevent ongoing and future harm independent of any particular IDR payment determination.

104. Highmark seeks a declaration that:

a. Defendants' initiation of IDR disputes for procedure codes as to which an IDR determination has already been rendered against the same payor within the preceding 90 calendar days violates the NSA's eligibility requirements and constitutes fraudulent and deceptive conduct under Pennsylvania law;

b. Defendants' submission of materially false and misleading information in IDR submissions—including misrepresentations regarding the QPA and Highmark's engagement in dialogue concerning in-network reimbursement rates—constitutes fraudulent and deceptive conduct under Pennsylvania law; and

c. Highmark is entitled to recover all amounts that Defendants have improperly obtained through disputes that were ineligible for the IDR process and that were procured through material misrepresentations, including full disgorgement of Defendants' unjust gains.

105. Highmark further seeks narrowly tailored injunctive relief:

a. Enjoining Defendants from initiating IDR disputes against Highmark for the same or similar item or service within 90 calendar days after an IDR determination involving the same provider and Highmark;

b.    Enjoining Defendants from submitting fabricated documents, non-Highmark reimbursement comparators represented as Highmark-specific, or false statements concerning Highmark's communications in IDR submissions directed at Highmark; and

c.    Requiring Defendants to maintain records and compliance controls sufficient to verify compliance with the 90-day cooling-off period and the authenticity of materials submitted in IDR proceedings involving Highmark.

106.    Highmark lacks adequate remedy at law to prevent recurrence of the specific misconduct alleged here. Monetary relief can compensate Highmark for past awards and fees, but it cannot prevent Defendants from continuing to initiate ineligible disputes barred by the 90-day cooling-off period or to submit fabricated or materially misleading materials in future IDR proceedings involving Highmark. To the extent the Departments' "Technical Assistance" permits reopening of certain closed disputes to correct jurisdictional errors, that process does not provide complete relief for concealed fraud in IDR submission packages, damages caused by Defendants' conduct, or prospective protection against repetition of the same misconduct. Highmark's request for injunctive relief is therefore targeted to objectively verifiable conduct, not a request for the Court to supervise the IDR process generally.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Highmark respectfully requests that this Court enter judgment against Defendants and award Highmark the following relief:

a.    An order vacating, pursuant to 42 U.S.C. § 300gg-111(c)(5)(E) and 9 U.S.C. § 10(a)(1) and (4), each IDR payment determination identified in Exhibit A and the representative examples alleged above, together with all amounts paid pursuant to those determinations and the associated administrative and IDRE fees;

b.      In the alternative to, and to the extent not duplicative of, the vacatur relief requested above, compensatory damages in an amount to be determined at trial, including all improper IDR payments, administrative fees, IDRE fees, and other costs attributable to Defendants' fraudulent conduct;

c.      Punitive damages in an amount sufficient to deter Defendants and others from engaging in similar fraudulent conduct;

d.      Restitution and disgorgement of all amounts improperly obtained by Defendants through the fraudulent conduct described herein;

e.      A declaratory judgment and injunctive relief as set forth in Count VI;

f.      Pre-judgment and post-judgment interest; and

g.      Such other and further relief as this Court deems just and proper.

**JURY TRIAL DEMANDED**

Highmark hereby demands a trial by jury on all claims and issues so triable.

**REED SMITH LLP**

Dated: June 3, 2026

*/s/ William J. Sheridan*
William J. Sheridan
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
412-288-7282
wsheridan@reedsmith.com

Mark E. Bini (*pro hac vice forthcoming*)
Kaela Dahan (*pro hac vice forthcoming*)
599 Lexington Avenue
New York, NY 10022
212-521-5400
mbini@reedsmith.com
kdahan@reedsmith.com

Anthony R. Todd (*pro hac vice forthcoming*)
10 South Wacker Drive
Chicago, IL 60606
312-207-1000
atodd@reedsmith.com

- 34 -